D.T. DAVIS ENTERPRISES, LTD., )
    *doing business as* )
    HOVERTECH INTERNATIONAL, )      Civil Action
                                        )      No. 12-cv-01374
           Plaintiff )
                                        )
        v. )
                                        )
ARJO, INC., )
                                        )
           Defendant )

\*      \*      \*

APPEARANCES:

        DOUGLAS J. SMILLIE, ESQUIRE
           On behalf of Plaintiff

        JEFFREY C. CLARK, ESQUIRE
        DAVID J. PIVNICK, ESQUIRE
        DANA WINDISCH CHILSON, ESQUIRE
        HARVEY FREEDENBERG, ESQUIRE
        ALAN R. BOYNTON, JR., ESQUIRE
           On behalf of Defendant

\*      \*      \*

## O P I N I O N

JAMES KNOLL GARDNER
United States District Judge

      This matter is before the court on Plaintiff's Motion

for a Temporary Restraining Order[1] and a Preliminary Injunction

---

[1]      On March 22, 2012 my colleague United States District Judge
Joel H. Slomsky, sitting as the emergency duty judge, conducted a telephone
conference on the record and with counsel for both parties present to address
plaintiff's request for a temporary restraining order. Following that
conference, Judge Slomsky issued an Order dated March 22, 2012 and filed

(Footnote 1 continued):

Pursuant to Fed.R.Civ.P. 65 (Document 4)("Plaintiff's Motion for Preliminary Injunction"), which motion was filed March 22, 2012.[2] Also before the court is the oral Motion for Judgment on Partial Findings, which oral motion was made on the record in open court on May 23, 2012 pursuant to Rule 52(c) of the Federal Rules of Civil Procedure after the close of plaintiff's case-in-chief on the second day the three-day hearing on Plaintiff's Motion for Preliminary Injunction.

## SUMMARY OF DECISION

For the reasons expressed below, I deny Plaintiff's Motion for Preliminary Injunction and grant defendant's oral Motion for Judgment on Partial Findings. Specifically, I deny plaintiff's motion and grant defendant's oral motion because plaintiff materially breached the Distribution Agreement[3] by failing to provide defendant with access to sell plaintiff's products in the United Kingdom. Because plaintiff materially breached the Distribution Agreement, plaintiff is not entitled

---

(Continuation of footnote 1):

March 23, 2012 denying plaintiff's request for a temporary restraining order only. Accordingly, a hearing was scheduled concerning plaintiff's request for a preliminary injunction which remained pending after Judge Slomsky's March 22, 2012 Order.

[2] Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction Pursuant to Fed.R.Civ.P. 65 (Document 4-2) and plaintiff's Exhibits 1 through 4 were filed March 22, 2012 together with Plaintiff's Motion for Preliminary Injunction.

[3] See Plaintiff's Exhibit 3, Distribution Agreement executed May 5, 2009 between plaintiff and defendant.

to a preliminary injunction and defendant is entitled to judgment in its favor on plaintiff's breach of contact claim asserted against defendant under the Distribution Agreement.

## JURISDICTION

This court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff D.T. Davis Enterprises, Ltd., doing business as HoverTech International ("HTI") is a citizen of Pennsylvania. Defendant Arjo, Inc. is a citizen of Delaware and Illinois. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

Venue is proper in this court pursuant to 28 U.S.C. § 1441(a) because plaintiff initiated its action against defendant in the Court of Common Pleas of Lehigh County, Pennsylvania, which is in this judicial district, and defendant removed the matter to this court.

Venue is also proper in this court pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to plaintiff's claims occurred in the City of Bethlehem, Pennsylvania, which is situated in both Lehigh and Northampton Counties. Both Lehigh County and Northampton County are located within this judicial district.

## **PROCEDURAL HISTORY**

On March 8, 2012 plaintiff D.T. Davis Enterprises, Ltd., doing business as HoverTech International, filed its Complaint for Preliminary and Permanent Injunctive Relief in the Court of Common Pleas of Lehigh County, Pennsylvania. That same day, plaintiff HTI filed a motion seeking preliminary injunctive relief from the Lehigh County Court of Common Pleas. A hearing on HTI's state-court motion was scheduled to commence before Judge William E. Ford of the Lehigh County Court of Common Pleas on Monday, March 19, 2012.

On Friday, March 16, 2012 defendant Arjo, Inc. ("Arjo") filed its Notice of Removal[4] in this court.

On March 22, 2012 HTI filed Plaintiff's Motion for Preliminary Injunction. That same day, United States District Judge Joel H. Slomsky, sitting as the emergency duty judge, conducted a telephone conference on the record with counsel for both parties. Following that telephone conference, Judge Slomsky issued an Order dated March 22, 2012 and filed March 23, 2012[5] which denied plaintiff's motion only to the extent that it sought a temporary restraining order.

---

[4]        Document 1. (Document numbers cited in this Opinion refer to Docket Entries in the official docket number 12-cv-01374-JKG in this matter.)

[5]        Document 5.

On April 5, 2012 Arjo filed Defendant's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction.[6]

I conducted a three-day hearing on Plaintiff's Motion for Preliminary Injunction on April 20,[7] May 23, and May 25, 2012.

During the first day of the preliminary injunction hearing, plaintiff made its opening statement and presented the testimony of David T. Davis, who is the President and owner of plaintiff HTI.

During the second day of the preliminary injunction hearing, plaintiff presented the testimony of Jerome T. Smith, who is the Chief Financial Officer and Chief Operating Officer of plaintiff HTI -- and admitted into evidence Plaintiff's Exhibits 1 through 12, 13a. through g., 14 through 17, 18a. through f., and 19 through 37. Following the admission of its exhibits, plaintiff rested.

During the second day of the hearing, defendant admitted into evidence Defendant's Exhibits 1 through 3, and 5

---

[6]          Document 17.

[7]          At the close of the first day of the preliminary injunction hearing, an off-the-record discussion was held between lead plaintiff's counsel, Douglas J. Smillie, Esquire, lead defense counsel Jeffrey C. Clark, Esquire, and the court concerning the scheduling of a subsequent date upon which to complete the hearing. Lead plaintiff's counsel was not available on the court's first available date following April 20, 2012. Lead defense counsel was not available for the court's second available date following April 20, 2012. Lead counsel for each party was available on the court's third available date, May 23, 2012. Accordingly, the preliminary injunction hearing was continued to May 23, 2012 and completed May 25, 2012.

and made its oral Motion for Judgment on Partial Findings pursuant to Rule 52(c).

Defendant argued in support of its oral motion, and plaintiff argued in opposition. At the close of the argument concerning defendants' oral motion, as noted on the record, I exercised my discretion under Rule 52(c) and declined to rule on defendant's oral motion until after the close of the evidence.

Defendant made its opening statement and then presented the testimony of Sandy Hough, Senior Clinical Manager for Diligent Services at Arjo, and Andrew Hepburn, Senior Director for Diligent Services at Arjo, and admitted into evidence Defendant's Exhibit 6.

On the third day of the preliminary injunction hearing, defendant presented the remainder of Andrew Hepburn's testimony. Plaintiff's Exhibit 38 was marked for identification during the Andrew Hepburn's testimony but was not moved into evidence.

Following completion of Andrew Hepburn's testimony, defendant moved for the admission of Defendant's Exhibit 7, the Declaration of Dan Raffensberger, and plaintiff raised a hearsay objection. After hearing argument on the objection, I took the objection under advisement, but permitted the parties to make reference to Defendant's Exhibit 7 in their closing arguments.

I now overrule the hearsay objection and Defendant's Exhibit 7 is admitted into evidence.[8]

At the conclusion of the preliminary injunction hearing, I took Plaintiff's Motion for Preliminary Injunction under advisement.[9]

Following the completion of the hearing, the parties submitted proposed findings of fact and conclusions of law and legal memoranda in further support of their respective positions.[10] The matter is now ripe for adjudication.

---

[8] See KOS Pharmaceuticals, Inc. v. Andrx Corporation, 369 F.3d 700, 718 (3d Cir. 2004). I overrule the hearsay objection to the Declaration of Dan Raffensberger because a request for preliminary injunction is customarily assessed on the basis of procedures that are less formal and evidence that is less complete than in a full trial on the merits. And accordingly, "affidavits and other hearsay materials are often received in preliminary injunction proceedings." Id.

[9] At the conclusion of the hearing, I ordered a verbatim transcript for each day of the hearing and gave each party until June 22, 2012 to file proposed findings of fact and conclusions of law with citations to the record developed at the hearing. Plaintiff's Post-Hearing Memorandum of Law in Support of Its Proposed Findings of Fact and Conclusions of Law (Document 38)("Plaintiff's Post-Hearing Memorandum") was filed with Plaintiff's Post-Hearing Proposed Findings of Fact and Conclusions of Law in Support of Its Motion for Preliminary Injunction Pursuant to Fed.R.Civ.P. 65 (Document 38-1) ("Plaintiff's Proposed Findings and Conclusions") on June 22, 2012. Defendant Arjo, Inc's Post Hearing Proposed Findings of Fact and Conclusions of Law (Document 39)("Defendant's Proposed Findings and Conclusions") was filed with Defendant Arjo, Inc.'s Memorandum of Law in Support of Its Proposed Findings of Fact and Conclusions of Law (Document 39-1)("Defendant's Post Hearing Memorandum") that same day.

[10] On June 22, 2012, Plaintiff's Post-Hearing Memorandum of Law in Support of Its Proposed Findings of Fact and Conclusions of Law (Document 38)(Plaintiff's Post-Hearing Memorandum"), was filed together with Plaintiff's Post-Hearing Proposed Findings of Fact and Conclusions of Law in Support of Its Motion for Preliminary Injunction Pursuant to Fed.R.Civ.P. 65 (Document 38-1).

(Footnote 10 continued):

## STANDARD OF REVIEW

## Preliminary Injunction

The United States Court of Appeals for the Third

Circuit has held that in determining whether to grant a

preliminary injunction, I must consider

> (1) whether the movant has shown a reasonable
> probability of success on the merits; (2) whether the
> movant will be irreparably injured by denial of the
> relief; (3) whether granting preliminary relief will
> result in even greater harm to the nonmoving party;
> and (4) whether granting the preliminary relief will
> be in the public interest.

Iles v. de Jongh, 638 F.3d 169, 172 (3d Cir. 2011); see also

Minard Run Oil Company v. United States Forest Service, 670 F.3d

236, 249-250 (3d Cir. 2011).  A plaintiff's failure to establish

any of these four elements in its favor renders a preliminary

injunction inappropriate.  Nutrasweet Company v. Vit-Mar

Enterprises, 176 F.3d 151, 153 (3d Cir. 1999).

## Judgment on Partial Findings

Rule 52(c) of the Federal Rules of Civil Procedure

provides:

---

(Continuation of footnote 10):

        Also on June 22, 2012, Defendant Arjo, Inc.'s Post Hearing
Proposed Findings of Fact and Conclusions of Law (Document 39), was filed
together with Defendant Arjo, Inc.'s Memorandum of Law in Support of Its
Proposed Findings of Fact and Conclusions of Law (Document 39-1)(Defendant's
Post-Hearing Memorandum").

**(c) Judgment on Partial Findings.** If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Rule 52(a) provides, in pertinent part:

**(1) In General.** In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

**(2) For an Interlocutory Injunction.** In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

In making a determination pursuant to Rule 52(c), I may make appropriate findings of fact and resolve disputed factual questions on a partial record. See Rego v. ARC Water Treatment Company of PA, 181 F.3d 396 (3d Cir. 1999).

## FACTUAL FINDINGS

Based upon the testimony and exhibits received during the preliminary injunction hearing, and the pleadings and record papers in this matter, I make the following findings of fact.[11]

## Parties

Plaintiff D.T. Davis Enterprises, Ltd., doing business as HoverTech International, ("HTI") is a Pennsylvania corporation with its principal place of business in Bethlehem, Pennsylvania. HTI employs 23 people and primarily utilizes independent contractors to sell and market HTI products. David T. Davis is the founder and President of HTI.

HTI is in the business of selling safe patient handling products, which include inflatable mattresses used in the lateral transfer of patients in acute care (emergency department) settings as well as short- and long-term care settings.

The HoverMatt is one of HTI's flagship products and is at the center of the parties' dispute.

HTI is a leader in the field of patient air-transfer technology. Indeed, HTI products account for approximately 70%

---

[11]    The Findings of Fact reflect my credibility determinations regarding the testimony and evidence presented at trial. Credibility determinations are within the sole province of the finder of fact, in this case the court. Fed.R.Civ.P. 52; See, e.g., Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739, 745 (1986).

of the United States domestic market for patient lateral air transfer devices.

Defendant Arjo, Inc. ("Arjo"), also known as ARJOHuntleigh, North America, is a Delaware corporation with its principal place of business in Addison, Illinois. Arjo has an extensive sales network and employs approximately 4,400 people worldwide.

Arjo is a patient-handling company which sells and distributes a range of health-care and patient-safety products. Arjo sells both consumable items, such as slippery sheets to assist in patient transfers, and capital goods. Among the capital goods sold by Arjo are beds, patient-handling lifts, ceiling-mounted lifts, bathing systems, therapy tanks, and deep-vein thrombosis garments.

Arjo sells a product called the "Maxi Air", which is a single patient lateral air transfer product, similar in appearance and function to HTI's HoverMatt.

In addition to individual product sales, Arjo markets a program called Diligent Services ("Diligent") to its hospital and long-term-care-facility clients. The Diligent Services program is geared toward reducing the risk of injury to a medical facility's staff and patients by integrating a range of equipment marketed by Arjo with training and consultation

provided by Arjo's clinical staff, which consists of various licenced health-care practitioners.

The Diligent Services program is one of Arjo's flagship offerings and has been implemented at more than 600 health-care facilities across the United States.

Arjo has a strong presence in the United Kingdom's healthcare market, particularly in the United Kingdom's hospitals, or acute-care facilities. Arjo has a an extensive network of 40-50 sales representative in place in the United Kingdom, which would permit Arjo to begin selling or renting HTI's products immediately upon gaining access to the United Kingdom under the Distribution Agreement.

The United Kingdom has safe-patient-handling laws, which have been in place since the 1990s and which requires hospitals and other healthcare facilities to have equipment available to assist in lifting and transporting patients. Consequently, there is a high demand for safe-patiently handling products in the United Kingdom.

### Pre-Distribution-Agreement Relationship

Arjo began selling HTI products in 2003 or 2004, at least four years before the execution of the May 5, 2009 Distribution Agreement upon which HTI brings this action.

Specifically, Arjo included HTI's HoverMatt and other HTI products in the product-mix available through Arjo's

Diligent program.  Arjo had HTI's permission to include the HoverMatt in its Diligent offerings.

The parties did not have any non-competition agreement or non-solicitation agreement between them during the period prior the Distribution Agreement, including the years 2004 through 2008, when Arjo sold the HoverMatt and other HTI products.

In addition to making its products available to customers through Arjo's Diligent program prior to the parties Distribution Agreement, HTI had its own distribution network in place to sell its products prior to the Distribution Agreement with Arjo.

<u>Acquisition Talks</u>

In 2008 defendant's parent company, Getinge Holdings USA, Inc. ("Getinge") and HTI entered into discussions concerning the potential purchase of the capital stock of HTI and another company owned by David T. Davis called Woodlark Circle, Inc. ("Woodlark").

Specifically, by letter of intent dated September 10, 2008, Getinge proposed that it would acquire 70% of the capital stock of both HTI and Woodlark for an initial payment of $15,500,000, with the remaining 30% of the capital stock of each entity to be acquired by the end of the calendar year 2011 based

upon a formula related to HTI's and Woodlark's performance during 2009, 2010, and 2011 and which used a multiplier of 10.

The September 10, 2008 letter of intent contained a confidentiality provision and, in furtherance of the acquisition, Getinge began to conduct its due diligence concerning HTI's business subject to the confidentiality clause.

As part of the due-diligence process relating to its potential acquisition, HTI provided volumes of information to Arjo and Getinge pertaining to HTI's business and finances. This information was provided to Arjo and Getinge pursuant to a confidentiality agreement. Subsequently, these confidentiality agreements were incorporated by reference in the confidentiality provision contained in the Distribution Agreement.

However, in December 2008, Getinge informed HTI that the acquisition could not be consummated at that time as intended because the added expense and debt of the acquisition would have required Getinge to re-negotiate certain loan covenants with its lenders, which Getinge did not want to pursue amidst the financial turmoil ongoing at that time.

Nonetheless, the acquisition of HTI by Arjo's parent company remained something that the parties, and Getinge, wanted to achieve. The Distribution Agreement at the center of this case was conceived as a bridging mechanism and toward the goal

of having an acquisition agreement in place by the end of calendar year 2009.

The parties were represented by counsel in connection with the proposed acquisition and the negotiation of the Distribution Agreement.

**Distribution Agreement**

On May 5, 2009, the parties -- plaintiff through its CEO, David T. Davis, and defendant through its President, Philip Croxford -- executed a Distribution Agreement ("the agreement"), the term of which commenced June 1, 2009 and continued until May 31, 2011.[12]

The agreement provides that

> HoverTech intends to supply ARJO in a *worldwide distribution agreement* for the HoverTech Product line as set forth in <u>Exhibit A</u> (as the same may be amended from time to time by agreement of the parties) for the purpose of supplying for rental and for sale into acute care and other healthcare settings (the "Products"), subject to the terms and conditions hereof and *with the reservations and exceptions as hereinafter set forth.*[13]

The agreement further provides that "HoverTech desires to appoint ARJO as a distributor for rental and for sale of the Products *within the territories identified in Exhibit B* attached hereto and incorporated herein by reference (the "Territory"),

---

[12]     <u>See</u> Distribution Agreement at ¶ 2.

[13]     Distribution Agreement at page 1, third "WHEREAS" clause (emphasis added).

and ARJO desires to rent/sell the Products in the Territory on the terms and conditions set forth herein.[14]

In short, Arjo was to be a distributor of HTI's products in geographic areas except those reserved and excluded by the Distribution, and more specifically by Exhibits B and B-1 to the agreement.

Exhibit B to the Distribution Agreement defines "Territory" as follows:

> Worldwide, **EXCEPT** for those territories described and further identified in yellow on Exhibit B-1 attached hereto and incorporated herein by reference, which territories shall be reserved to HoverTech (collectively, the "Reserved Territories"), and **EXCEPT** for those portions of the Territory subject to existing exclusive HoverTech distributorship agreements with third parties, unless and until such time as those existing exclusive distributorship agreements have been terminated.[15]

The Distrubution Agreement precluded Arjo from renting or selling HTI products in the following: Washington, Oregon, Alaska, Hawaii, California, Nevada, Idaho, Utah, Arizona, New Mexico, Colorado, Wyoming, Montana, North Dakota, South Dakota, Nebraska, Kansas, Texas, Florida (Gainesville to Orlando and all of the state west and south of highway #27), Eastern half of Pennsylvania (State College to State boundary), New York (excluding 5 boroughs, Long Island, & Westchester County),

---

[14]      Distribution Agreement at page 1, fourth "WHEREAS" clause (emphasis added).

[15]      Id. at page 18, Exhibit B.

Connecticut, Rhode Island, Massachusetts, New Hampshire, Vermont, Maine, the United Kingdom, Australia and New Zealand, and Canada and British Columbia.[16]

Following the listing for the United Kingdom on the list of Reserved Territories reserved to HoverTech and, thus closed to Arjo, Exhibit B-1 states:

> to be discussed- agreement in place until 12/31/10
>
> A separate plan will be worked out with the UK to complement the existing distributor as they have a vertical strategy within the **bariatric surgery centers market and AH handling the rest of the marketplace.**[17]

HTI did not actively discuss the establishment of a plan for Arjo to have partial access to the United Kingdom to complement HTI's existing distributorship.  However, HTI did inquire with its exclusive United Kingdom distributor about terminating the exclusive agreement and permitting Arjo access to the United Kingdom.  The existing exclusive United Kingdom distributor would not agree to grant Arjo partial access or to cancel the exclusive agreement prior to its expiration.

Following the listing for "Canada and British Columbia", Exhibit B-1 states " –6/22/2009."[18]

---

[16]        Distribution Agreement at page 19, Exhibit B-1 (listing the states included in the Reserved Territories, and, specifically, a separate listing for "Canada and British Columbia").

[17]        Id. (emphasis in original).  "Bariatric surgery" means surgery related to the Treatment of obesity.

[18]        Id.

-17-

The agreement expressly manifests the intent of both HTI and Arjo to "be legally bound" by the "mutual covenants and agreements" contained in the Distribution Agreement.[19]

Concerning the position into which Arjo is appointed by the Distribution Agreement, the agreement provides, in pertinent part

> Subject to the terms and conditions of this Agreement, HoverTech hereby appoints ARJO as a distributor of the Products within the Territory for the purpose of the rental and sale of the Products, and ARJO hereby accepts such appointment. The Territory shall not include the Reserved Territories as defined in Exhibit B and as depicted in Exhibit B-1 hereto. Notwithstanding anything to the contrary contained in this Agreement, ARJO acknowledges and agrees that HoverTech will honor all order received by its representatives other than ARJO under prior distribution agreements for accounts relating to certain Veterans Administration facilities as listed in Exhibit C attached hereto and incorporated herein by reference (collectively, the "VA Accounts"), provided that (a) the VA Account is listed in Exhibit C, (b) HoverTech receives the order by October 31, 2009, and (c) the Product is shipped by December 31, 2009. Such sales for VA Accounts are permitted notwithstanding this Agreement, and ARJO agrees that (x) it shall have no claim for any monetary compensation for such orders and shipments, and (y) it shall have no claim that HoverTech may not honor orders or ship Products relative to the VA Accounts and pay compensation to HoverTech's representatives or distributors other than ARJO therefor.[20]

---

[19]     Distribution Agreement at page 1, following "NOW, THEREFORE".

[20]     Id. at ¶ 1.

Paragraph 5 of the Distribution Agreement describes the obligations of Arjo under the agreement, in pertinent part, as follows:

> (a)  Except for the purchasers subject to GPO or IDN contracts which shall continue to be governed thereby, ARJO may rent or sell the Products within the Territory at such prices and on such terms as ARJO shall determine in its sole discretion.  Nothing herein shall be construed to require ARJO to refrain from renting, selling or promoting products of other manufacturers within the Territory which directly compete with the Products, except for other air transfer products and products which compete directly with HoverTech's HoverMatt® and HoverJack®, which ARJO expressly covenants it will not rent, sell or promote. For purposes hereof, any product consisting of an air inflatable device to lift patients shall be deemed to compete directly with HoverTech's HoverJack®.

Prior to execution of the Distribution Agreement on May 5, 2009, the parties supplemented paragraph 5(f) of the agreement by adding the following language:

> The parties hereby agree that *if ARJO has the opportunity to enter into any new GPO or IDN contracts during the term of this Agreement*, the parties shall negotiate the sales price from HoverTech to Arjo in good faith, to be reviewed every three (3) months and adjusted to insure that ARJO shall be able to achieve *a 34% blended gross profit margin* by the end of each calendar year *on such Products* on substantially the same terms and conditions as under the current GPO/IDN Agreements.[21]

---

[21]  Distribution Agreement at ¶ 5(f)(emphasis added).

With respect to the reasonableness of the terms of the Distribution Agreement, the agreement itself expressly provides that

> ARJO agrees that the terms of this Agreement, including *but not limited to* Section 12 on Termination are fair and reasonable, and will not cause any hardship to ARJO.[22]

With respect to termination and its effect, paragraph 12 of the Distribution provides, in pertinent part:

> (b) Either party *may* terminate this Agreement upon thirty (30) days written notice if the other party is in default in the performance of any material obligation under this Agreement and the other party fails to cure such default within such period.[23]

> (c) The failure of ARJO to meet or exceed the Yearly Minimum for a specific portion of the Territory shall be grounds for immediate termination by HoverTech for such portion of the Territory, provided however that HoverTech shall give written notice thereof to ARJO specifying the termination date. The Yearly Minimum for a specific portion of the Territory shall be determined as that portion's share of the total worldwide aggregate sales (as set forth in Exhibit E), times the total Yearly Minimum for the applicable year (i.e. $4,340,766 for Year 1 and $8,632,543 for Year 2).

> *   *   *

> (e) Each party's obligations under Sections 9 (Indemnity), 14 (Representation), 17 (Confidentiality), 18 (Restrictive Covenant), 20 (Choice of Law), 21 (Jurisdiction), 22 (Attorneys Fees), and 23 (Notices) of this Agreement shall expressly survive the termination of this Agreement.

---

[22] Distribution Agreement at ¶ 5(i)(emphasis added).

[23] Id. at ¶ 12(b)(emphasis added).

The Distribution Agreement contains the following confidentiality provision:

> The parties acknowledge and agree that they will use information disclosed to or learned by them hereunder or in connection herewith, only to the extent necessary for the performance of their respective obligations hereunder. Each party hereby acknowledges that the other party would be irrevocably damaged if any of the confidential information ("Proprietary Information") were disclosed to or utilized on behalf of any person, firm or business entity.... Said Proprietary Information shall include, but not be limited to, customer pricing, distributor pricing, research and development efforts, HoverTech employees, vendors, or methods of distribution, or other information not generally available to the public. Notwithstanding the preceding, Proprietary Information shall not include information which (a) was already known to the receiving party prior to disclosure by the disclosing party; (b) is or had been entered to the public domain through no breach of this Agreement by the receiving party; (c) has been rightly received from a third party who is not known to be under any obligation of confidentiality with respect to such information; (d) has been approved for release by written authorization of the disclosing party; or (e) has been independently acquired or developed by the receiving party without violation of its obligations under this Agreement. ARJO further acknowledges that has previously executed Non-Disclosure Agreements with HoverTech and its affiliates and agrees that it continues to be bound thereby.[24]

The Restrictive Covenant at the center of this action is found at paragraph 18(a) of the Distribution Agreement, and provides, in pertinent part:

---

[24]      Distribution Agreement at ¶ 17.

(a)  During the term of this Agreement, and if ARJO
terminates this Agreement or this Agreement is
terminated due to the default or breach of ARJO, for a
period of two (2) years thereafter, but in all other
events for a period of one (1) year thereafter, ARJO
shall not, either solely or jointly with, or as an
agent or contractor for another person, firm or
entity, directly or indirectly, carry on or be
engaged, concerned or financially interested in any
company carrying on any business utilizing air
transfer technology, or in any way be in competition
with HoverTech by offering for sale or rental (i) any
air transfer products, (ii) any products which compete
directly with HoverTech's HoverMatt® or HoverJack®,
and/or (iii) any air inflatable device for lifting,
transferring or transporting patients.[25]

The Restrictive Covenant in Paragraph 18 of the

Distribution Agreement further provides that

[i]f ARJO violates the foregoing covenant, the damages
to HoverTech, it is agreed, are largely intangible and
incalculable, and the harm to HoverTech would be
irreparable.  Therefore, if ARJO breaches, violates or
knowingly attempts or threatens to violate any of the
provisions, covenants or restrictions of this
Section 18, HoverTech shall be entitled to an
injunction, to be issued by any court of competent
jurisdiction, enjoining and restricting ARJO from
committing such violation or continuing such
violations, regardless of proof of actual damages, and
HoverTech shall be entitled to recover HoverTech's
costs and attorney's fees in such action and upon any
appeal there from, as well as damages which may be
recovered.[26]

Paragraph 18 also contains a provision concerning the

purpose of the restrictive covenant:

---

[25]         Distribution Agreement at ¶ 18(a).

[26]         Id.

-22-

(c) ARJO acknowledges and agrees that the restrictions set forth herein are (i) *reasonable for the protection of HoverTech's legitimate business interests*, (ii) not unduly restrictive on ARJO's ability to create income, and (iii) a material inducement to HoverTech to enter into this Agreement with ARJO.[27]

The Distribution Agreement contains an express provision concerning waiver and delay with respect to breaches of the agreement:

No waiver by either party of any breach or series of breaches or defaults in performance by the other party, and no failure, refusal, or neglect of either party to exercise any right, power, or option given to it hereunder or to insist upon strict compliance with or performance of either party's obligations under this Agreement, shall constitute [1] a waiver of the provisions of this Agreement *with respect to any subsequent breach* thereof or [2] a waiver by either party of its right at any time thereafter to require exact and strict compliance with the provisions thereof.[28]

The Distribution Agreement contains an integration clause which provides:

This Agreement and its Exhibits, together with Non-Disclosure Agreements and Diligent Agreements previously executed by the parties, contain all of the terms and conditions agreed upon by the parties hereto with reference to the subject matter hereof. No other agreements, oral or otherwise, shall be deemed to exist or to bind either of the parties hereto, and all prior agreements and understandings are superseded hereby. Except as specifically set forth herein, this

---

[27]  Distribution Agreement at ¶ 18(c)(emphasis added).

[28]  Id. at ¶ 24 (emphasis added).

-23-

Agreement cannot be modified or changed except by
written instrument signed by both of the parties
hereto.[29]

### Continued Acquisition Talks

On December 16 2009, after the Distribution Agreement
had been in effect for six-and-a-half months, Getinge issued a
second letter of intent concerning its acquisition of HTI.
However, the proposed acquisition price was substantially lower
than the price proposed in the September 10, 2008 letter of
intent.

Specifically, the December 2009 letter of intent
proposed an initial payment for acquisition of 70% of the
capital stock of HTI and Woodlark of $11,200,000 (whereas the
September 2008 letter had proposed $15,500,000) and the
multiplier used in the formula applied to HTI's performance
during the three-year earn-out period was reduced from 10 to 8,
thereby reducing the price for the remaining 30% of the capital
stock in HTI and Woodlark.

Based upon the substantial reduction in the proposed
acquisition price in the December 16, 2009 letter of intent, HTI
elected not to pursue the proposed acquisition.

Prior to the May 31, 2011 expiration date for the
Distribution Agreement, Arjo sought to negotiate an extension of
the Distribution Agreement and its parent company again

---

[29]          Distribution Agreement at ¶ 26.

-24-

expressed interest in acquiring HTI.  However, no agreement was reached to extend the Distribution Agreement and HTI was not acquired by Arjo's parent company.

Rather, the Distribution Agreement expired by its own terms on May 31, 2011.  Because the Distribution Agreement expired by its own terms, the applicable time period for the Restrictive Covenant was one year, until May 31, 2012.

## Post-Distribution-Agreement Conduct

In February 2012, HTI learned that Arjo had begun selling an air assisted patient lateral transfer system called the "Maxi Air".

On February 21, 2012, after learning of Arjo's sales of the Maxi Air, HTI sent a letter to Arjo reminding it of its obligations under the Restrictive Covenant.

Arjo responded by letter dated March 2, 2012, the body of which states, in pertinent part:

> This letter is in response to your February 21, 2012
> letter (the "Letter").  In the Letter, you allege that
> ArjoHuntleigh is somehow in violation of a restrictive
> covenant contained in the Distribution Agreement (the
> "Agreement") between HoverTech ("HTI") and ArjoHunt-
> leigh.  While you make repeated references to the
> restrictive covenant, I just want to make clear that
> ArjoHuntleigh believes that the restrictive covenant
> is not valid or enforceable under Pennsylvania law,
> and even if it was, HTI's various breaches of the
> Agreement would prevent HTI from enforcing the
> restrictive covenant.  We would also suggest that it

is in the best interest of both companies to move on, as the Agreement has been terminated for nearly a year now.[30]

The March 2, 2012 letter was the first time that Arjo had expressed to HTI that it believed that the Restrictive Covenant in the Distribution Agreement is unenforceable.

On March 8, 2012 plaintiff filed its Complaint in the Court of Common Pleas of Lehigh County seeking to enforce the Restrictive Covenant.

The annual Safe Patient Handling Show -- the largest annual trade show for the parties' industry -- was held over several days commencing March 19, 2012.  Approximately one week after the 2012 show, Jackie Tate (the employee responsible for the safe patient handling program at Nash General Hospital, an HTI customer) sent David Davis a document purporting to demonstrate the annual savings which Nash General could achieve by using Arjo's MaxiAir product as compared to the lateral air transfer products offered by HTI.

## CONCLUSIONS OF LAW

Based upon the Findings of Fact above, and for the reasons expressed in the Discussion below, I deny Plaintiff's Motion for Preliminary Injunction and grant defendant's oral Motion for Judgment on Partial Findings.

---

[30]      Plaintiff's Exhibit 11, letter dated March 2, 2012 to David T. Davis, HoverTech International, from Philip Croxford, President & CEO, ArjoHuntleigh, North America.

Specifically, I deny plaintiff's motion and grant defendant's oral motion because plaintiff materially breached the Distribution Agreement by failing to provide defendant with access to sell plaintiff's products in the United Kingdom. Because plaintiff materially breached the Distribution Agreement, plaintiff is not entitled to a preliminary injunction and defendant is entitled to judgment in its favor on plaintiff's breach of contact claim asserted against defendant under the Distribution Agreement. Specifically, I conclude:

1.    The Complaint asserts a single cause of action by plaintiff against defendant for breach of the Restrictive Covenant in the parties Distribution Agreement.

2.    Plaintiff does not have a reasonable likelihood of success on the merits of its breach of contract claim because it materially breached of the Distribution Agreement.

3.    Plaintiff's material breach of the Distribution Agreement bars plaintiff's breach of contract claim against defendant.

4.    Defendant did not waive its right to assert, and is not estopped from asserting, a material breach by plaintiff as a defense to plaintiff's claim.

5.    The Distribution Agreement was not modified by the conduct of the parties.

Accordingly, I also enter judgment in favor of defendant Arjo, Inc. and against plaintiff D.T. Davis Enterprises, Ltd., doing business as HoverTech International, on plaintiff's Complaint.

## DISCUSSION

### Contentions of the Parties

#### Plaintiff's Contentions

Plaintiff contends that it motion for preliminary injunction should be granted because it has satisfied each requirement for obtaining preliminary injunctive relief under the standard of review described above.

Specifically, plaintiff contends that it has demonstrated a reasonable likelihood of success on the merits of its breach of contract claim against defendant because the Restrictive Covenant is enforceable under Pennsylvania law and defendant sold the Maxi Air product in competition with plaintiff's HoverMatt and in violation of the Restrictive Covenant.

Plaintiff further contends that it entitled to a preliminary injunction because it has demonstrated that it will suffer irreparable harm if a preliminary injunction enforcing the Restrictive Covenant is not issued.

Plaintiff further contends that granting such preliminary relief will not result in even greater harm to the

nonmoving party because defendant would, in effect, simply be getting what it bargained for if the Restrictive Covenant were enforced by a preliminary injunction.

Finally, plaintiff contends that granting the preliminary relief will be in the public interest because the public interest is served by the enforcement of contracts, particularly, as here, the contract was negotiated at arms-length, with counsel, between two business entities.[31]

<u>Defendant's Contentions</u>

Defendant Arjo contends that the court should deny Plaintiff's Motion for Preliminary Injunction and grant defendant's oral Motion for Judgment on Partial Findings for several reasons.

Defendant contends that the Restrictive Covenant does not serve any legitimate business interest, but rather is a naked attempt to restrain competition, and is, thus, unenforceable under Pennsylvania law.

---

[31] In support of its public-interest argument, plaintiff describes itself as a "small local business", as contrasted against the larger corporate defendant with thousands of employees and a world-wide distribution network. As a matter of sheer size and location, and as contrasted against defendant, plaintiff's characterization of itself is accurate and perfectly reasonable.

However, I note that although this dispute is between business entities of very different sizes, it is not a dispute where one of the individual or entity is relatively unsophisticated and the other is a very sophisticated party.

Defendant further contends that the Restrictive Covenant is limitless in its geographic scope and, thus, unreasonably broad and unenforceable under Pennsylvania law.

Defendant further contends that plaintiff breached the Distribution Agreement in several respects, plaintiff's breaches of the Distribution Agreement were material, and, accordingly, defendant was no longer bound by, and plaintiff may not now enforce, the Restrictive Covenant.

Defendant asserts the above arguments to support the ultimate position that plaintiff is not entitled to preliminary injunctive relief because it cannot show a reasonable likelihood of success on the merits of its breach of contract claim, and that defendant is entitled to judgment on partial findings because plaintiff cannot enforce (for various reasons) the Restrictive Covenant on which it sues.

In addition, defendant contends that plaintiff is not entitled to preliminary injunctive relief because it can be compensated by money damages for any sales lost because of defendant's violation of the Restrictive Covenant, and, thus, plaintiff cannot demonstrate the immediate, irreparable injury necessary to obtain preliminary injunctive relief.

Finally, defendant contends that the issuance of a preliminary injunction would be inappropriate because, at the time of defendant's oral motion, there were only 8 days

remaining until the May 31, 2012 expiration of the term of the
Restrictive Covenant, and there is no basis to equitably toll or
otherwise extend the term of the restrictive covenant beyond
May 31, 2012.

## Likelihood of Success/Material Breach

In order to obtain preliminary injunctive relief,
plaintiff HTI must demonstrate that it has a reasonable
likelihood of success on the merits of its breach of contract
claim against defendant Arjo.  See Iles, 638 F.3d at 172;
Nutrasweet, 176 F.3d at 153.

However, plaintiff is not reasonably likely to
succeed, and indeed cannot succeed, on the merits of its breach
of contract claim if plaintiff itself materially breached the
contract.

Under the substantive law of Pennsylania law, which
the parties agree is applicable to this action, "[w]hen
performance of a duty under a contract is due, any
nonperformance is a breach." Williams Engineering, Inc. v.
Dufalla, 837 A.2d 459, 467 (Pa.Super. 2003).  "If a breach
constitutes a material failure of performance, then the non-
breaching party is discharged from all liability under the
contract.  If, however, the breach is an immaterial failure of
performance, and the contract was substantially performed, the
contract remains effective." Dufalla, 837 A.2d at 467.

Whether a breach is material "is a question of degree" and Pennsylvania courts consider several factors in assessing materiality:

> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;
>
> c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

Dufalla, 837 A.2d at 468 (quoting Restatement (Second) of Contracts § 241).

Upon consideration of the foregoing factors, I conclude that plaintiff materially breached the Distribution Agreement by failing to (A) work out a plan for Arjo to complement HTI's then-existing exclusive distributorship in the United Kingdom prior to January 1, 2011,[32] and (B), at the very

---

[32]    The Distribution Agreement provides that "[t]he Commencement Date for any portion of the Territory subject to an existing exclusive HoverTech distribution agreement shall automatically extend until the day following the last day of the term of any existing HoverTech distribution agreement in that portion of the Territory." (Distribution Agreement at ¶ 2.) The agreement further provides that "HoverTech agrees to use commercially reasonable

(Footnote 32 continued):

least, provide Arjo with access to the United Kingdom as of
January 1, 2011 upon the expiration of the HTI's pre-existing
exclusive United Kingdom distributorship on December 31, 2010.

The first factor -- namely, the extent to which the
injured party will be deprived of the benefit which he
reasonably expected -- weighs heavily in favor of finding a
material breach.  Based upon the agreement that the parties,
including HTI, would work out a plan for Arjo to complement
HTI's existing exclusive distributor, Arjo could reasonably
expect that it would have some access to the United Kingdom
prior to the December 31, 2010 expiration of the existing
exclusive HTI distributorship.

Moreover, because the existing exclusive United
Kingdom HTI distributorship expired on December 31, 2010, Arjo
could reasonably assume that it would have complete access to
the United Kingdom market from January 1, 2011 through the end
of the term of the Distribution Agreement on May 31, 2011.

That Arjo was deprived of at least five months of
complete access, and an additional period of partial access, to
sell HTI products in the United Kingdom -- a market with high

---

(Continuation of footnote 32):

efforts to terminate its existing exclusive distributorship agreements within
the Territory as soon as reasonably possible and to promote the successful
transfer of HoverTech independent representatives within the Territory to
ARJO representatives."  (Id.)

demand for safe patient handling equipment and in which Arjo had an extensive presence and network of sales representatives -- deprived it of the reasonably-anticipated benefits of the Distribution Agreement to a substantial degree.

The second factor -- the extent to which the injured party can be adequately compensated -- also supports the conclusion that HTI materially breached the Distribution Agreement. Because of HTI's failure to establish a plan to provide Arjo with partial access to the United Kingdom prior to January 1, 2011 and to provide complete access to the United Kingdom from that date forward, Arjo was deprived of the opportunity to generate revenue through the sale and rental of HTI products, and to enhance its presence and position in the United Kingdom healthcare market.

Because the number of sales and/or rentals (and the price Arjo could have obtained for those rentals) which Arjo could have made within the United Kingdom under the Agreement, and the degree and monetary value of an enhancement in Arjo's presence in the United Kingdom healthcare market would be difficult to ascertain, money damages for this breach would not adequately compensate Arjo for its lost opportunity. Accordingly, the second factor weighs in favor of a finding that the breach was material.

The third factor -- the extent to which the party failing to perform or to offer to perform will suffer forfeiture -- does not weigh against a finding that HTI's breach was material because HTI will not suffer forfeiture as result of that finding, but rather will be precluded from enforcing the Restrictive Covenant.

The fourth factor -- the likelihood that the party failing to perform or offer to perform will cure his failure -- weighs in favor of finding a material breach.  Plaintiff, simply, cannot now cure its breach.  HTI cannot reverse the sands of time to provide Arjo with partial access to the United Kingdom's healthcare market prior to January 1, 2011, nor can HTI provide Arjo with unfettered access to that market from January 1, 2011 through the expiration of the distribution agreement.

The fifth and final factor -- the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing -- does not weigh against a finding of materiality.  Although HTI did not actively discuss the establishment of a plan for Arjo to have partial access to the United Kingdom to complement HTI's existing distributorship, HTI did inquire with its exclusive United Kingdom distributor about terminating the exclusive agreement and permitting Arjo access to the United Kingdom.

However, the existing exclusive distributor would not
agree to grant Arjo partial access or to cancel the exclusive
agreement prior to its expiration. While HTI made some effort
to obtain access to the United Kingdom for Arjo prior to January
1, 2011, Arjo was not granted access to the United Kingdom after
January 1, 2012, when the pre-existing HTI exclusive
distributorship expired.

For the reasons expressed above, I conclude that HTI's
failure to work out a plan for Arjo to complement HTI's then-
existing exclusive distributorship in the United Kingdom prior
to January 1, 2011,[33] and to provide Arjo with complete access to
the United Kingdom as of January 1, 2011 constituted a material
breach of the Distribution Agreement by HTI.

Because I conclude that plaintiff materially breached
the Distribution Agreement, I further conclude that plaintiff
failed to demonstrate a reasonable likelihood of success on the
merits of its claim against defendant for breach of the
Restrictive Covenant contained in the Distribution Agreement,

---

[33]     The Distribution Agreement provides that "[t]he Commencement Date
for any portion of the Territory subject to an existing exclusive HoverTech
distribution agreement shall automatically extend until the day following the
last day of the term of any existing HoverTech distribution agreement in that
portion of the Territory." (Distribution Agreement at ¶ 2.) The agreement
further provides that "HoverTech agrees to use commercially reasonable
efforts to terminate its existing exclusive distributorship agreements within
the Territory as soon as reasonably possible and to promote the successful
transfer of HoverTech independent representatives within the Territory to
ARJO representatives." (Id.)

and that defendant is entitled to judgment in its favor on plaintiff's breach of contract claim.

## **Waiver/Estoppel/Modification**

Plaintiff argues that defendant waived its opportunity to assert, or is estopped from asserting as a defense, prior breaches of the Distribution Agreement by plaintiff because defendant failed to exercise the remedy provided in para-graph 12(b) of the Distribution Agreement.[34] That argument is undermined by the Distribution Agreement itself.

The Distribution Agreement provides that "[e]ither party *may* terminate this Agreement upon thirty (30) days written notice if the other party is in default in the performance of any material obligation under this Agreement and the other party fails to cure such default within such period."[35] The Distribution Agreement thus gives the non-breaching party the option to (after giving the breaching party notice and an opportunity to cure) terminate the Distribution Agreement based upon a material breach that agreement.

Moreover, the Distribution Agreement specifically addresses the issue of waiver and provides, in pertinent part,

---

[34]      That provision states that "[e]ither party *may* terminate this Agreement upon thirty (30) days written notice if the other party is in default in the performance of any material obligation under this Agreement and the other party fails to cure such default within such period." Distri-bution Agreement at ¶ 12(b)(emphasis added).

[35]      <u>Id.</u>

that "[n]o waiver by either party of any breach...and no failure, refusal, or neglect of either party to exercise any right, power, or option given to it ...shall constitute a waiver of the provisions of this Agreement with respect to any subsequent breach."[36]

Alternatively, plaintiff argues that the terms of the Distribution Agreement were modified by Arjo's continued acceptance of performance by HTI after the actions by HTI which Arjo now asserts were material breaches of the Distribution Agreement.

As with plaintiff's waiver argument, the Distribution Agreement expressly provides that any modification of the agreement were required to be in writing and signed by both parties.[37] Accordingly, to the extent that plaintiff argues that the conduct of which defendant now complains cannot be a breach of the agreement because the agreement was modified to permit that same conduct, that argument is similarly unavailing.

### CONCLUSION

For all the forgoing reasons, I deny Plaintiff's Motion for Preliminary Injunction. I grant defendant's oral Motion for Judgment on Partial Findings. Accordingly, I enter

---

[36]         Distribution Agreement at ¶ 24 (emphasis added).

[37]         Specifically, paragraph 26 of the Distribution Agreement provides, in pertinent part, that "this Agreement cannot be modified or changed except by written instrument signed by both of the parties hereto."

judgment in favor of defendant and against plaintiff on Plaintiff's Complaint for Preliminary and Permanent Injunctive Relief.